AO 91 (Rev. 11/82)

# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br><br>HENRY JOVANNY AMBRIZ and<br>HIRAM ZAVALA TALAMANTE | DOCKET NO. |
|---|---|
| | MAGISTRATE'S CASE NO.<br>**17-0292M** |

Complaint for violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(A)(viii)

| NAME OF MAGISTRATE JUDGE<br>HONORABLE ROZELLA A. OLIVER | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE<br>February 8, 2017 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

### [21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

On or about February 8, 2017, in Los Angeles County, within the Central District of California, defendants HENRY JOVANNY AMBRIZ and HIRAM ZAVALA TALAMANTE knowingly and intentionally possessed with intent to distribute at least 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A)(viii).

FILED
CLERK, U.S. DISTRICT COURT
FEB - 9 2017
CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>**KENT M. STEVENSON** /s/ |
|---|---|
| | OFFICIAL TITLE<br>Task Force Officer - DEA |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1)<br>ROZELLA A. OLIVER | DATE<br>February 9, 2017 |
|---|---|

(1) See Federal Rules of Criminal Procedure 3 and 54

AUSA Victoria A. Degtyareva x17635 /VAD REC: Detention

## AFFIDAVIT

I, Kent M. Stevenson, being duly sworn, declare and state as follows:

### I.    PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint against HENRY JOVANNY AMBRIZ ("AMBRIZ") and HIRAM ZAVALA TALAMANTE ("TALAMANTE") for a violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(A)(viii) (Possession with Intent to Distribute Methamphetamine).

2.    This application is also made in support of an application for a warrant to search the following digital devices seized by the United States Drug Enforcement Administration ("DEA") from HENRY JOVANNY AMBRIZ and HIRAM ZAVALA TALAMANTE on February 8, 2017 (the "AMBRIZ AND TALAMANTE PHONES"), and currently in the custody of DEA, as described more fully in Attachment A:

a.    A Rose Gold Apple iPhone, with a cracked screen, bearing IMEI number 353334-07-051377-1;

b.    A white LG LGMS330 cell phone, bearing IMEI number 352974-08-860502-71;

c.    A white LG LGMS330 cell phone, bearing IMEI number 352974-08-346338-0; and

d.    A white LG LGMS330 cell phone, bearing IMEI number 352974-08-860503-5.

3.    The requested search warrant seeks authorization to seize any data on the AMBRIZ AND TALAMANTE PHONES that constitutes evidence or fruits of violations of Title 21, United

Instrumentality Protocol

States Code, Sections 841(a)(1), (b)(1)(A)(viii) (Possession with Intent to Distribute Methamphetamine) and 846 (Conspiracy to Distribute Methamphetamine), as described more fully in Attachment B. Both Attachments A and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II.  BACKGROUND FOR TASK FORCE OFFICER KENT M. STEVENSON

5. I am a United States Drug Enforcement Administration ("DEA") Task Force Officer ("TFO") and an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7). I am empowered to conduct investigations and to make arrests for federal and state felony offenses. I am certified by the California Attorney General to conduct wiretaps as authorized in California Penal Code Section 629.50 et seq.

6. I have been a sworn police officer with the City of Vernon Police Department ("VPD") since December 2000. I am presently assigned to the DEA Los Angeles Field Division as a TFO for the Southwest Border Initiative Group 4 ("SWB-4"). I

Instrumentality Protocol

2

have worked as a Detective and Police Officer for VPB and have worked within the narcotics canine unit. I have investigated offenses involving fraud, narcotics, crimes against persons, assaults with deadly weapons, and crimes against property. I received my formal police training from the Orange County Sheriff's Academy, located in Garden Grove, California. I have also received advanced officer training throughout my career that includes formal and in-house training in the area of criminal investigations. I have received over 1,500 hours of training in California Peace Officer Standards of Training ("P.O.S.T.") certified courses.

7.      Based on my training, experience and discussions with several senior DEA Agents, I am familiar with drug traffickers' methods of operation, including the distribution, storage, and transportation of drugs and the collection and laundering of the money proceeds of drug trafficking. I am also familiar with methods employed by large drug trafficking organizations to thwart detection by law enforcement, including the use of debit calling cards, public telephones, cellular telephone technology, counter surveillance, false or fictitious identities, and encoded communications. I have also utilized a variety of investigative techniques and resources, including database searches, physical surveillance, and the use of information obtained through cooperating sources.

### III. SUMMARY OF PROBABLE CAUSE

8.      In several recorded telephone and in-person conversations from on or about January 29, 2017, to on or about

Instrumentality Protocol

3

February 8, 2017, HENRY JOVANNY AMBRIZ ("AMBRIZ") agreed to sell approximately 60 pounds of methamphetamine to a confidential source ("CS") working on behalf of DEA.[1]

9.   On February 8, 2017, the CS met with AMBRIZ in Huntington Park, California.  During the meeting, the CS and AMBRIZ agreed that AMBRIZ would load methamphetamine into a hidden compartment of a car the CS provided to AMBRIZ.  AMBRIZ then drove the car to another location, where he met with HIRAM ZAVALA TALAMANTE ("TALAMANTE").  AMBRIZ told the CS in a recorded telephone call that he had finished loading the car, and arranged to meet the CS to complete the deal.  When AMBRIZ and TALAMANTE arrived at the meeting location, they were detained by agents from the Southwest Border Initiative Group 4 ("SWB-4").  During a subsequent search of the car the CS had provided to AMBRIZ, agents found approximately 24.9 kilograms, or approximately 54.78 pounds, of suspected methamphetamine inside a hidden compartment that the CS had shown to AMBRIZ.

## IV.   STATEMENT OF PROBABLE CAUSE

A.   February 1, 2017 Meeting with AMBRIZ and TALAMANTE

10.   Based on my review of investigative reports and recordings, as well as my conversations with law enforcement officers who participated in this investigation and with the CS, I know the following:

---

[1] The CS was convicted in 2007 for grand theft, in violation of California Penal Code Section 487(a).  The CS has worked with DEA since 2006, and has been paid a total of approximately $994,000 since that time.  The Simi Valley Police Department paid the CS an additional approximately $1,500 for his work on the instant investigation.

Instrumentality Protocol

a.    On or about January 25, 2017, an unidentified Hispanic male known as "Toro" told the CS during an unrecorded and unmonitored telephone call that he had a methamphetamine supplier known as "El Pariente" in Los Angeles, California from whom the CS could purchase 60 pounds of methamphetamine for $150,000.   "Toro" told the CS that he would give the CS "El Pariente's" telephone number so that "El Pariente" and the CS could arrange the deal.

b.    On or about January 28, 2017, during an unrecorded and unmonitored telephone call, "Toro" told the CS to call telephone number 909-678-9151 ("the 909 number") to purchase methamphetamine from "El Pariente."

c.    On or about January 29, 2017, the CS placed a recorded call to 909 number.   During the call, the CS and "El Pariente" discussed a potential meeting in the near future near Huntington Park, California.

d.    In approximately 10 recorded telephone calls between on or about January 29, 2017, and on or about February 1, 2017, the CS and "El Pariente" agreed to meet on February 1, 2017.

e.    On or about January 30, 2017, the Honorable Judge Margaret Bernal of the Superior Court of California, County of Los Angeles, approved a search warrant application for the disclosure of Global Positioning System ("GPS") cell-site information for the 909 number.   Using cell-site information obtained pursuant to the search warrant, SWB-4 agents obtained the location of the phone using the 909 number.

Instrumentality Protocol

5

f.   On or about February 1, 2017, at approximately 11:45 p.m., FBI Special Agent (SA) Tray Barnes and I met with the CS at a pre-determined brief location.  SA Barnes and I searched the CS and his vehicle for controlled substances or other contraband, with negative results.  SA Barnes and I then provided the CS with an audio recording device.

g.   At approximately 12:15 p.m., SWB-4 agents established surveillance in and around a Target store located at 5700 Firestone Boulevard, South Gate, California (the "Target"), where the CS was planning to meet "El Pariente."  The CS arrived at the location approximately fifteen minutes later.

h.   During several recorded telephone calls between 12:55 p.m. and 1:40 p.m., the CS told "El Pariente" to meet him at the Target.  "El Pariente" said he would arrive in a white Jeep Cherokee in approximately twenty minutes.

i.   At approximately 1:55 p.m., SWB-4 agents saw a white Jeep Cherokee, with California license plate number 7JEL618 (the "Jeep Cherokee"), enter the parking lot of the Target.  GPS cell site information data confirmed that the phone using the 909 number was in the parking lot of the Target at that time.

j.   A man, later identified as TALAMANTE, was in the driver's seat of the Jeep Cherokee and a second man, later identified as AMBRIZ, was in the front passenger seat.  AMBRIZ exited the Jeep Cherokee, walked across the parking lot to the CS's car, and got inside.  During a recorded conversation inside the car that lasted approximately 25 minutes, the CS asked

Instrumentality Protocol

AMBRIZ if he/she could purchase one pound of methamphetamine from AMBRIZ.  AMBRIZ said he had a pound of methamphetamine nearby, but it was not of good quality and AMBRIZ did not want to sell bad quality drugs to the CS.[2]  AMBRIZ also told the CS he had a new telephone number, 442-271-1471 (the "442 number").

k.   The CS and AMBRIZ exited the CS's car at approximately 2:10 p.m., and walked into the Target to use the restroom.   The CS's recorder was still on while the CS and AMBRIZ were inside the Target.   The CS walked back out of the Target approximately 10 minutes later, while AMBRIZ remained inside.

l.   SA Barnes and I met the CS at a pre-determined debrief location, where we searched the CS and his car for controlled substances or other contraband, with negative results.

**B.   February 8, 2017 Drug Deal**

11.   Based on my review of investigative reports and recordings, as well as my conversations with law enforcement officers who participated in this investigation and with the CS, I know the following:

a.   On or about February 6, 2017, I directed the CS to make a recorded telephone call to AMBRIZ at the 442 number to discuss arranging a drug deal.  During the telephone call, using

---

[2] While the CS and AMBRIZ were inside the CS's car, TALAMANTE drove the Jeep Cherokee out of the Target parking lot to an auto mechanic shop in the area of 52nd street and S. Santa Fe Avenue, Los Angeles, where he met with several unidentified individuals.  Agents stopped surveillance of the Jeep Cherokee at that time due to a lack of manpower.

Instrumentality Protocol

coded language, the CS and AMBRIZ discussed the quality of the drugs that AMBRIZ would sell to the CS, and arranged to meet on February 8, 2017, to complete the deal.

b.    On or about February 8, 2017, at approximately 10:58 a.m., DEA SA Albert Smith and I met the CS at a pre-determined brief location.  DEA provided the CS with a Special Purpose Official Government Vehicle (the "OGV"), which was equipped with a GPS tracking device, to conduct the deal.  SA Smith and I searched the CS and the OGV for controlled substances or other contraband with negative results.  SA Smith and I then provided the CS with an audio recording device.

c.    At approximately 11:55 a.m., the CS called AMBRIZ at the 442 number and told AMBRIZ that the CS was at a Home Depot store located at the intersection of Slauson Avenue and State Street in Huntington Park, California (the "Home Depot").

d.    At approximately 12:05 p.m., AMBRIZ arrived at the Home Depot in a white Honda Civic, with California License plate number 7VEC791 (the "white Honda Civic"), which was driven by TALAMANTE.  After dropping AMBRIZ off in the parking lot, TALAMANTE left the location.  AMBRIZ walked to the OGV, and the CS showed AMBRIZ how to operate a hidden compartment inside of the OGV.  The CS and AMBRIZ agreed that AMBRIZ would take the OGV to an undisclosed location and fill the hidden compartment with 60 pounds of methamphetamine.

e.    Approximately 10 minutes later, AMBRIZ got into the OGV alone and left the Home Depot parking lot.  DEA agents followed AMBRIZ out of the parking lot to the vicinity of 2448

Instrumentality Protocol

8

E. 52nd Street in Huntington Park, California.  The OGV backed
into a commercial lot behind the building at 2448 E. 52nd
Street, out of the agents' sight.

        f.    At approximately 1:25 p.m. the CS called AMBRIZ
to check on the status of the drugs.  AMBRIZ told the CS that he
was almost done loading.  The CS called AMBRIZ several more
times to get updates, and all of the telephone calls were
recorded.  During the last telephone call, AMBRIZ told the CS he
was ready and would meet the CS at a donut shop located at
Slauson Avenue and Santa Fe Avenue (the "donut shop").

        g.    DEA agents saw AMBRIZ leave the lot behind the
building at 2448 E. 52nd Street in the OGV.  Agents also saw
TALAMANTE, who was driving the white Honda Civic, follow AMBRIZ
out of the lot.  Agents lost surveillance of the two cars.  GPS
data from the OGV revealed that the OGV was in the parking lot
of the donut shop, where AMBRIZ had asked the CS to meet him.

        h.    At approximately 1:55 p.m., the CS called AMBRIZ
and told AMBRIZ that the CS was at the Norms restaurant located
at Malabar Street and Slauson Avenue (the "Norms").  AMBRIZ
agreed to the meet the CS at the Norms.

        i.    At approximately 2:36 p.m., AMBRIZ entered the
parking lot of the Norms in the white Honda Civic, which was
driven by TALAMANTE.  AMBRIZ and TALAMANTE were detained.  While
agents were detaining AMRBIZ, he dropped the keys to the OGV
from his hand onto the ground.  During a search of the white
Honda Civic, agents found the four AMBRIZ AND TALAMANTE PHONES
inside the car.

                                    Instrumentality Protocol

j.    At approximately 2:46 p.m., DEA SA Wes Bedford went to the donut shop and retrieved the OGV.  During a subsequent search of the OGV, agents found approximately 50 pounds of a substance that resembled methamphetamine inside of the hidden compartment.

k.    At the DEA office, agents weighed the suspected methamphetamine found in the OGV and confirmed the total weight of the suspected methamphetamine was 24.9 kilograms.

C.    **Post-Arrest Interviews**

12.   Based on my conversations with DEA SA Wes Bedford, I know the following:

a.    Later that day, on February 8, 2017, AMBRIZ and TALAMANTE were advised of their Miranda rights.  AMBRIZ invoked his right to remain silent, and no further questioning was conducted of AMBRIZ.  In a recorded conversation, TALAMANTE agreed to waive his Miranda rights.

b.    During an interview, TALAMANTE told SA Bedford that the substance inside of the OGV was methamphetamine.

c.    TALAMANTE also told SA Bedford that he rented the building at 2448 E. 52nd Street, and gave SA Bedford written consent to search the lot behind the building.  TALAMANTE gave SA Bedford a key to the gate of the lot and a key to a Budget truck located on the property.  TALAMANTE told SA Bedford that he had rented the truck a few days previously.  Inside the truck, agents found approximately 14.5 kilograms of suspected methamphetamine, 6.4 kilograms of suspected cocaine, and 2.1 kilograms of suspected heroin.  TALAMANTE told SA Bedford that

Instrumentality Protocol

the substances inside the truck were methamphetamine and
cocaine.

       d.    TALAMANTE further told SA Bedford that the Rose
Gold Apple iPhone with a cracked screen and one of the white LG
LGMS330 cell phones belonged to TALAMANTE; while the other two
white LG LGMS330 cell phones belonged to AMBRIZ.

## V.   TRAINING AND EXPERIENCE REGARDING DRUG TRAFFICKING OFFENSES

    13.  Based on my training and experience and familiarity
with investigations into drug trafficking conducted by other law
enforcement agents, I know the following:

       a.    Drug traffickers use telephones, portable
cellular and digital telephones, pagers, and other communication
device sometimes in fictitious and/or other individuals' names
and maintain telephone and address books, telephone bills, and
other books and papers that reflect names, addresses, and/or
telephone numbers of their associates in the narcotics
trafficking organization and customers of their narcotics
business.

       b.    Drug traffickers use mobile phones to conduct
drug trafficking operations, including communicating with
suppliers, customers, and co-conspirators by phone, text
message, e-mail, and social media. Drug traffickers generally
do not conduct transactions for large amounts without first
communicating matters such as quantity, price, arrival time, and
meet location, often through a telephone or mobile device such
as the AMBRIZ AND TALAMANTE PHONES. Further, drug traffickers
will also use text messages to send photographs as codes or

Instrumentality Protocol

actual pictures of the contraband being trafficked as part of narcotics transactions.

      c.   I know that it is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones utilizing digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VI.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES

14.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that it is not always possible to search digital devices for digital data in a single day or even over several weeks for a number of reasons, including the following:

      d.   Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  There are so many types of digital devices and software programs in use today that it takes time to conduct a thorough search.  In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the type of digital device, operating system, and software application being searched.

      e.   Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.

Instrumentality Protocol

Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

      f.    It is difficult to estimate the precise storage space contained on the device listed in Attachment A before conducting a preliminary examination of the device, but, based on my training and experience, I know that cellular telephones can contain multiple gigabytes of storage space.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.

      g.    Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files saved to a hard drive can be stored for years with little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  Normally, when a person deletes a file on a digital device, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or

Instrumentality Protocol

slack space, i.e., space on a hard drive that is not allocated
to an active file or that is unused after a file has been
allocated to a set block of storage space, for long periods of
time before they are overwritten. In addition, a digital
device's operating system may also keep a record of deleted data
in a swap or recovery file. Similarly, files that have been
viewed on the Internet are often automatically downloaded into a
temporary directory or cache. The browser typically maintains a
fixed amount of hard drive space devoted to these files, and the
files are only overwritten as they are replaced with more
recently downloaded or viewed content. Thus, the ability to
retrieve residue of an electronic file from a hard drive depends
less on when the file was downloaded or viewed than on a
particular user's operating system, storage capacity, and user
habits. Recovery of residue of electronic files from a hard
drive requires specialized tools and a controlled laboratory
environment. Recovery also can require substantial time.

　　　　h.　　Although some of the records called for by this
warrant might be found in the form of user-generated documents
(such as word processing, picture, and movie files), digital
devices can contain other forms of electronic evidence as well.
In particular, records of how a digital device has been used,
what it has been used for, who has used it, and who has been
responsible for creating or maintaining records, documents,
programs, applications and materials contained on the digital
devices are, as described further in the attachments, called for
by this warrant. Those records will not always be found in

Instrumentality Protocol

digital data that is neatly segregable from the hard drive image as a whole.  Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the digital device were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the digital device was in use.  Digital device file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

     i.   Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be

Instrumentality Protocol

necessary to show that malicious software that allows someone
else to control the digital device remotely is not present on
the digital device.  Evidence of the absence of particular data
on a digital device is not segregable from the digital device.
Analysis of the digital device as a whole to demonstrate the
absence of particular data requires specialized tools and a
controlled laboratory environment, and can require substantial
time.

        j.    Digital device users can attempt to conceal data
within digital devices through a number of methods, including
the use of innocuous or misleading filenames and extensions.
For example, files with the extension ".jpg" often are image
files; however, a user can easily change the extension to ".txt"
to conceal the image and make it appear that the file contains
text.  Digital device users can also attempt to conceal data by
using encryption, which means that a password or device, such as
a "dongle" or "keycard," is necessary to decrypt the data into
readable form.  In addition, digital device users can conceal
data within another seemingly unrelated and innocuous file in a
process called "steganography."  For example, by using
steganography a digital device user can conceal text in an image
file that cannot be viewed when the image file is opened.
Digital devices may also contain "booby traps" that destroy or
alter data if certain procedures are not scrupulously followed.
A substantial amount of time is necessary to extract and sort
through data that is concealed, encrypted, or subject to booby

Instrumentality Protocol

traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

15.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VII.  CONCLUSION

16.   Based on the foregoing, there is probable cause to believe that HENRY JOVANNY AMBRIZ ("AMBRIZ") and HIRAM ZAVALA TALAMANTE ("TALAMANTE") violated Title 21, United States Code, Sections 841(a)(1), (b)(1)(A)(viii) (Possession with Intent to Distribute Methamphetamine).

17.   Furthermore, there is probable cause to believe that the evidence, fruits, and instrumentalities of the offenses described in Attachment B will be found on the digital devices described in Attachment A.

_____/s/_____
Kent M. Stevenson
Task Force Officer
Drug Enforcement Administration

Subscribed to and sworn before
me this 9th day of February,
2017.

ROZELLA A. OLIVER

HONORABLE ROZELLA A. OLIVER
UNITED STATES MAGISTRATE JUDGE

Instrumentality Protocol

ATTACHMENT A

PROPERTY TO BE SEARCHED

The following digital devices, seized on February 8, 2017, and currently maintained in the custody of the Drug Enforcement Administration ("DEA") in Los Angeles, California:

1.  A Rose Gold Apple iPhone, with a cracked screen, bearing IMEI number 353334-07-051377-1;

2.  A white LG LGMS330 cell phone, bearing IMEI number 352974-08-860502-7l;

3.  A white LG LGMS330 cell phone, bearing IMEI number 352974-08-346338-0; and

4.  A white LG LGMS330 cell phone, bearing IMEI number 352974-08-860503-5.

Instrumentality Protocol

ATTACHMENT B

## I.   ITEMS TO BE SEIZED

1.   Evidence, fruits, and instrumentalities of violations
of Title 21, United States Code, Sections 841(a)(1),
(b)(1)(A)(viii) (Possession with Intent to Distribute
Methamphetamine) and 846 (Conspiracy to Distribute
Methamphetamine), namely:

a.   Records, documents, programs, applications or
materials, or evidence of the absence of same, sufficient to
show address book information, including all stored or saved
telephone numbers;

b.   Records, documents, programs, applications or
materials, or evidence of the absence of same, sufficient to
show call log information, including all telephone numbers
dialed from any digital devices and all telephone numbers
accessed through any push-to-talk functions, as well as all
received or missed incoming calls;

c.   Records, documents, programs, applications or
materials, or evidence of the absence of same, sufficient to
show SMS text, email communications or other text or written
communications sent to or received from any digital device;

d.   Records, documents, programs, applications or
materials relating to the trafficking of controlled substances,
including ledgers, pay/owe records, distribution or customer
lists, correspondence, receipts, records, and documents noting
price, quantities, and/or times when controlled substances,

Instrumentality Protocol

i

firearms, and ammunition were bought, sold, or otherwise
distributed;

       e.   Records, documents, programs, applications, or
materials showing payment, receipt, concealment, transfer, or
movement of money generated from the sale of controlled
substances, including documents written in vague or coded
language, and including bank account records, wire transfer
records, bank statements, pay-owe sheets, receipts, safe deposit
box keys and records, money containers, financial records, and
notes;

       f.   Audio recordings, pictures, video recordings, or
still captured images relating to the possession or distribution
of controlled substances and the collection, transfer or
laundering of the proceeds of the above-described offenses;

       g.   Contents of any calendar or date book;

       h.   Global Positioning System ("GPS") coordinates and
other information or records identifying travel routes,
destinations, origination points, and other locations;

       i.   Any device used to facilitate the above-listed
violations (and forensic copies thereof).

   2.   With respect to any device used to facilitate the
above-listed violations or containing evidence falling within
the scope of the foregoing categories of items to be seized:

       a.   evidence of who used, owned, or controlled the
device at the time the things described in this warrant were
created, edited, or deleted, such as logs, registry entries,
configuration files, saved usernames and passwords, documents,

Instrumentality Protocol

ii

browsing history, user profiles, e-mail, e-mail contacts, chat
and instant messaging logs, photographs, and correspondence;

       b.    evidence of the presence or absence of software
that would allow others to control the device, such as viruses,
Trojan horses, and other forms of malicious software, as well as
evidence of the presence or absence of security software
designed to detect malicious software;

       c.    evidence of the attachment of other devices;

       d.    evidence of counter-forensic programs (and
associated data) that are designed to eliminate data from the
device;

       e.    evidence of the times the device was used;

       f.    passwords, encryption keys, and other access
devices that may be necessary to access the device;

       g.    applications, utility programs, compilers,
interpreters, or other software, as well as documentation and
manuals, that may be necessary to access the device or to
conduct a forensic examination of it;

       h.    records of or information about Internet Protocol
addresses used by the device;

       i.    records of or information about the device's
Internet activity, including firewall logs, caches, browser
history and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

Instrumentality Protocol

II.   SEARCH PROCEDURE FOR DIGITAL DEVICE

        3.   In searching the devices listed in Attachment A (or
forensic copies thereof), law enforcement personnel executing
this search warrant will employ the following procedure:

        a.   Law enforcement personnel or other individuals
assisting law enforcement personnel (the "search team") may
search any device capable of being used to facilitate the above-
listed violations or containing data falling within the scope of
the items to be seized.

        b.   The search team will, in its discretion, either
search each device where it is currently located or transport it
to an appropriate law enforcement laboratory or similar facility
to be searched at that location.

        c.   The search team shall complete the search of the
devices as soon as is practicable but not to exceed 120 days
from the date of issuance of the warrant.  The government will
not search the digital devices beyond this 120-day period
without first obtaining an extension of time order from the
Court.

        d.   The search team will conduct the search only by
using search protocols specifically chosen to identify only the
specific items to be seized under this warrant.

        i.   The search team may subject all of the data
contained in each device capable of containing any of the items
to be seized to the search protocols to determine whether the
device and any data thereon falls within the scope of the items
to be seized.  The search team may also search for and attempt

                                        Instrumentality Protocol

                            iv

to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

        ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

        iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

        e.   If the search team, while searching a device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

        f.   If the search determines that a device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

        g.   If the search determines that a device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

                                          Instrumentality Protocol

h.   If the search determines that the device is (1) itself an item to be seized and/or (2) contains data falling within the list of items to be seized, the government may retain forensic copies of the device but may not access data falling outside the scope of the items to be seized (after the time for searching the device has expired) absent further court order.

i.   The government may retain a device itself until further order of the Court or one year after the conclusion of the criminal investigation or case (whichever is latest), only if the device is determined to be an instrumentality of an offense under investigation or the government, within 14 days following the time period authorized by the Court for completing the search, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending).  Otherwise, the government must return the device.

j.   After the completion of the search of the devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

4.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

Instrumentality Protocol